We will hear argument next in number 22, 2276 Sumitomo Pharma against Vidal. Mr. Saunders, can you just begin by, do I understand right this patent expired a couple of weeks ago? Yes, the patent expired on February 20th. And so what's at stake? This is a difficult question I've been thinking about. There is still a look back period for it. It's a highly regulated entry. Are there generics that have actually entered? There are generics who have entered the market pursuant to settlement agreements. So what would be at stake here is whether there has been unauthorized use. I can't stand before you and presently say we are aware that it's happened in the last six years, but the possibility... Is that a problem for our jurisdiction? I think that in general, when you're within the six-year look back period, the court has... But in this industry, they couldn't have entered, right? Right. In this industry, then it may be that the proper course here is a munting wear figure, which is if this has become moot through actions beyond the control of the parties, then the solution is not to leave this opinion on the books, but to say we've lost jurisdiction during the course of the appeal here and the opinion and the problematic reasoning, which we're worried about, would be vacated due to mootness. Okay. On the merits. On the merits, I'd like to start by highlighting three of the many errors of law that the board made in addressing our groundbreaking treatment claims. First, the board incorrectly held that and the board thus refused to consider the prior art's concern with the serious risk of sudden cardiac death, a concern that was so acute that our own sophisticated partner abandoned the project due to that risk. Second, the board misapplied the law of inherency, both in applying it prematurely and in misapplying the patient claim in an internally inconsistent way, switching focus midway through between a patient population and this theory of an individual outlier patient, even though they should be treated consistently within the claim. And then the third main error I want to highlight is the board shifted the burden of persuasion when it was discussing the Horasawa reference, and that's an issue on which the director hasn't even responded at all. So- This compound seems to act on particular receptors, and so there's a suggestion that it will have a weak weight gain effect. Right. There's a suggestion there, and so that analysis that the board does, on the front end, it's entered into a burden shifting framework because of the overlapping ranges it saw in the Saji reference. But this court made clear in its DuPont case that within that framework, the burden of persuasion always remains on the challenger. But the board framed that analysis at the beginning in terms of us not overcoming that burden, not showing through our evidence an argument that was incorrect. And then you also see this in the way it discussed Horasawa because rather than reaching a firm conclusion on wouldn't disregard the reference. But that's not really the question that is supposed to be before the board. It's in light of that speculative statement in Horasawa lined up against the counter evidence that we came forward to showing there's no consistent relationship here between these binding profiles and- Of the general class of atypicals. Is that- Yes, yes. In the general class. You can go, you can look at those same receptors and see, and we have the chart here, it's page 19 of the blue brief, which shows that some things that have strong binding affinity, some other compounds that have weak binding affinity, some that have very similar profiles, one will have what game, one won't. So we come forward with all that. And what the board does is really misapplying the Beckman line of cases, just says, well, Horasawa wouldn't be disregarded. It's thinking in the terms of, if a reference isn't working for its stated purpose, it may still have a valid teaching in there. But the question at that point was not one of, would you disregard Horasawa? It's, is a person of ordinary scale going to have a reasonable expectation of success based on its speculation when there's so much uncertainty in the art and we've come forward with all of this other- And what is the success of which there must be a reasonable expectation? The, it is the claimed success here. So in that, in that case, the focus was on the of weight gain. And more generally, the reason I began with the safety concern is because it, it was a mistake for the board to say, we're going to completely disregard the safety concern unless it's expressly claimed. All the time in, in this industry, safety is always a concern. Last year in this course, Amgen v. Sandow's case, we cited, there was no express claim element going to safety, but the fact that there were structure, structural similarity to thalidomide was a very relevant fact in the prior art in terms of shaping the decisions that we made. Even outside this context, we cited the Arctic Cat case where with the new throttle system on the jet skis there, again, there's no specific claim element saying, and this produces a safe jet ski, but the prior art concerns of, well, is this new throttle mechanism- The one argument that you were making in your briefing was with respect to potentially an inconsistent application of the word patient? Yes. Does that interplay in your kind of three points or is that a separate aspect? So the safety point cuts across everything and no point in its analysis does the board consider it tells us exactly why it's not, because it says this is legally irrelevant if not claimed, that is a mistake of law, that alone requires remand. Then in the board's analysis, it gets very confusing, quite frankly, as to when it's invoking inherency and when it's talking about reasonable expectation of success. And so on the inherency prong, the two issues that we are raising in that context are the order in which the evidence is being considered and rather than considering all the evidence to determine what selections and modifications would be made and only then applying inherency, the board considers some of the evidence, then reaches a conclusion of inherency to disregard the rest. And then that's where we get into the patient as well, because within the inherency analysis, what the board's essentially saying is, if you look at administering this to a big population of patients, then you're inherently going to find some outlier who wouldn't gain weight, because it wasn't basing this, it's very unusual inherency analysis, it wasn't trying to base it in actual data, it had this outlier theory. And in doing that, it's essentially starting the claim by reading the patient who's administered in terms of a patient population, and it's finishing the claim by reading the patient who's administered in terms of the individual patient. That's the only way the outlier theory works, is you find that outlier amid a big population. And I understand the opinion in the inherency context, but whether it's inherency or reasonable expectation of success, that's a big problem, that switch midway through the claim. We're not disputing the basic starting premise of patient could be one or more, but within the claim, there has to be internal consistency. So this is like this court's opinion in Salazar v. AT&T, where it said a microprocessor, and it had to perform certain functions. So it could be one or more, but you couldn't be switching and looking at those functions and saying, well, this processor performs that one, and this processor performs that one. I'm not sure if this is a coherent question. Can you state affirmatively what a non-switching line of reasoning would have looked like here? A non-switching line of reasoning would say, I'm either going to focus on an individual patient and think of any patient sort of picked at random. I administer the drug to that person. Is that person going to gain weight or not? And whether that is an inherency analysis, there's no reason to think that any individual patient, or you would have to look at a patient population as a whole and do the analysis of say, if I administer to that patient population, then what do I expect about that population? And the board never did that analysis because it switched midway through and went to this outlier theory. Well, would there be a legitimate way of looking at it that says the question is whether a relevant skilled artisan would have been motivated to perform the claim specified steps, so using the racidone, is that what it's called? Yes. The racidone in the 20 to 120 milligram once a day regimen on a large enough pool of patients, whatever that number is, to have a reasonable expectation of success in producing the claim specified effect of no Well, before you can get to that point, your honor, you have to think about the initial motivation. Right. I'm building in that you would need a motivation to do the steps. I'm separating the steps from the property that follows when you do the steps. So there would be things that would into that, into the motivation. You say, I think, when you're reading Sagi, why would you select the racidone among lots of other possibilities? You say, why would you select more than 100 milligrams? Not select, but go to more than 100 milligrams. Why would you do once a day? I want to put aside the once a day. And then a reasonable expectation of success would depend on some knowledge of how unlikely this is, and maybe whether it would be worthwhile if the probability was sufficiently low, you wouldn't do that. I'm trying to understand how this is supposed to work. Right. I think that is, with all the premises your honor has laid out, I think that is the analysis that would have to be done in terms of thinking of that population. Not anything the board did. We're not asking this court to do it. It's something that the board should be doing on remand. In terms of the expectations here, what we know from the background expectations is this is a class of drugs, the atypical antipsychotic, that is plagued by weight gain problems. And the one drug that is overcoming that, ziprosidone, is the one that has risk of sudden cardiac death. And the petitioner's theory here, and sort of framing this for the board, was to try to do this analogy to ziprosidone, and say, well, that would be structurally similar. And so in terms of the background expectations here, really it is an expectation of weight gain, with the one potential exception being a drug that then creates this expectation of, quite frankly, an even worse problem that the board was failing to consider. What's a good precedent, from your point of view, about needing a reason to pick out loracidone in SAGI, from SAGI's larger pool of subject compounds? Well, I think it follows just in general. I'm not sure a particular case to come to mind. It follows in general from the principle that SAGI is, as we've described, it's sort of a pick and choose disclosure. It's such a large, we're talking about a genus of more than a million compounds, all of these different ranges. Remember, even at the end of SAGI, the petitioner's own theory was going to dose ranging studies at the end of that, because even within the range that's been focused on, on the dose, that doesn't cover some individually claimed doses, like the 120 milligram dose is out of it. So this wasn't presented as an anticipation theory, because it was recognized that SAGI has these disclosures. It really is a claim directed to the composition, and so all these pieces would have to be pieced together. Right. I guess I'm just wondering whether, and I just don't remember whether this was in the board or in the director's brief, a kind of, let's just start with the fact that SAGI discloses the racetone. Now we can talk about everything else, but we get to start with that. And I thought at least one of your points was, you don't get to start with that, you need to have a motivation to start with that. I'm trying to understand how to think about that. Yes, I think the way to think about it is, it's such a large genus, and so decisions have to be which of these compounds, even within SAGI, are you going to? And we've ended up with a theory that takes us to the compound that has structural similarities to zaprasidone. And then we've pointed out the alternatives to SAGI, and the long list of alternatives, and long, because that's going to be in the background, the back of the mind of a person of ordinary skill, is, well, am I really going to go down this course? Remember, when we talk about performing dose ranging studies, or things like testing for half-life, we're talking about testing these drugs in humans. Am I going to go down this course with this drug that comes with all this baggage, when I have alternatives to loracetone within SAGI, and many, many more alternatives outside of SAGI as well? And it plugs into an incredibly unpredictable art. And for there, I think the Honeywell case we've cited is the best one in terms of criticizing the board for applying inherency before it considered that unpredictability in the art, which would go to the initial selections and combinations that might bear on whether inherency is applied. A few clarifying questions? Okay. Are you arguing that the board's analysis of the objective indicia of abacus was insufficient? It was a little unclear. Sometimes I thought you might have been taking some... Yes. ... with that, but I wanted the clarification. Right. And for two reasons. One, on the skepticism objective indicia, that's the withdrawal of the commercial partner. The board just says, we refuse to consider this if it's not claimed. And then the other thing was, by the time it reaches and analyzes the objective indicia, it basically discounts them based on its inherency finding on weight gain. So it's saying, well, yes, you have all these amazing things that have come with this compound commercial success. It meets a long felt need. But because we found the weight gain inherent, that overrides it. And the objective indicia and some very similar evidence going to the unpredictability needed to be considered upfront before you could get to that sort of operative combination of steps that would output the inherency finding. So it's really a question of, because it considers it in the wrong order, it doesn't give it the complete and correct consideration that it should. And then also, are you arguing that the board's motivation to modify analysis for the dosing range wasn't sufficient in any way? Well, it was because it didn't consider that unpredictability in the art and the concerns about weight gain. Because remember, by the time we're talking about here, there are already eight compounds on the market. The real focus is not just, can I get something effective? It's that combination, the sweet spot that was hit here in terms of, can I get something effective that avoids the weight gain? Because weight gain leads to all sorts of direct medical problems and compliance problems as well. And the board doesn't, in thinking about that path and all the selections and modifications for fluoresceinone, it doesn't think about how weight gain or safety factor in there. Instead, it reaches that conclusion, then uses its own inherency finding coming out of that to disregard the weight gain. So it's considering it at the wrong part of the analysis. And then I just want to give you maybe a few seconds, because I know we're over. In specific, you talk about, I don't know if I'm saying it correctly, the Horisawa reference and this weak effect on weight gain. Right. So Horisawa, it has this sort of speculative statement based on this very early in vitro testing. We came forward with evidence saying, well, look, it's highlighting certain receptor profilos, but olanzapine and ciprazidone, they have similar binding on that profile, but wildly diversion effects on weight gain. We sort of came forward with all the unpredictability evidence. And we're not asking this court to reweigh the facts on Horisawa. We're saying, we want you to sort of police the legal framework that the board was using. And at the beginning of the analysis, it is saying that it finds our evidence and argument insufficient to rebut the presumption of obviousness. So it's improperly placing the burden of persuasion on us, even though it's court held in the DuPont case that that doesn't shift. And then at the end of the Horisawa analysis, it's that indeterminate conclusion, just saying, well, you wouldn't... It notes our evidence and says, well, someone wouldn't disregard Horisawa. And as I said earlier, that's not the question. When you put them all together, what lesson is the person of ordinary skill going to draw from the art as a whole? Thank you. Good morning, your honors. May it please the court. I'd like to address several things, questions the court asked and the answers provided by my friend across the aisle. The first is Judge Toronto's question regarding, well, why would one of ordinary skill in the art pick loracidone from SAGI? It's not whether one of ordinary skill in the art would pick loracidone from SAGI. As the board notes in its decision, SAGI picked from that large sheet of six compounds to be lead compounds. Loracidone is number 101 of those compounds. And SAGI claimed only six of those compounds, one of which was loracidone and claimed 14. And so one of ordinary skill in the art wouldn't go through some large genus. One of ordinary skill in the art at most would go through the six that SAGI discloses are important. And it's important to note that when we look at Horisawa and we're trying to decide, this is one of the questions that the court asked about and one of the responses my friend gave, when we're looking at Horisawa and Sumitomo refers to all this other teaching away, the reason why, and the board doesn't just conclude that Horisawa is more persuasive, if you read the board's analysis on the page prior, the board discusses how Horisawa is actually the closer and most relevant prior art. Horisawa is a Sumitomo researcher presenting data on exactly the drug at issue in this case. The very first paragraph of begins with the assumption or the knowledge already that loracidone has few extra pyramidal effects. And then it wants to see... Right, but that, I'm sorry, that's not what's at issue. All the atypicals have few extra pyramidal effects. Weight gain's not one of those. Well, it starts with that and this is why we want to investigate it. And just correct me if I... I mean, my understanding was the typicals, the big problem was extra pyramidal effects, motor control, whatnot. The atypicals came in and their great selling point was much, much reduced extra pyramidal effects, but weight gain is not an extra pyramidal effect. Right. And then it goes on to... Then Horisawa goes on. Again, only looking at loracidone, we have a Sumitomo scientist saying that the results of looking at the binding affinities for loracidone, which it refers to as SM13496, that in addition to treating schizophrenia very well, based on these low binding affinities for the alpha-1, H1, and 5-HT2C receptors, it is suggested that the weight gain effect would be weak. And as to the safety concerns that my friend has talked about, Horisawa also states that it is also suggested that those cardiovascular negative effects will also be weak in this case. And these other references... You can see, though, that the board failed to appropriately address the safety concerns that were raised by opposing counsel. No, I don't, because they are correct, that the safety concern is not something that's claimed. Certainly when Sagi's patent, Sumitomo's patent on the drug, that those safety concerns, at least that patent is enabled for all that it teaches, and so it's enabled as far as the PTO needs to address safety concerns. Any concerns beyond that, as this court has held on multiple occasions, are safety concerns are really for the FDA to examine. Safety concerns don't play into a motivation of a skilled artisan to move down the path? I'm sorry, Your Honor. You didn't say that. I didn't say that. That seems to me the point you're trying to make. There is a lower threshold to enable, as far as safety concerns, to enable a patent or enable the prior art as it relates to the invention now claimed, than exists at the FDA. And in any event, Hirasawa, to say that even without reciting it in its claims, because they could have just as easily, if that was really something they wanted to claim, said without inducing clinically significant weight gain and without causing serious cardiovascular effects, they didn't say that. That's not in their claim. Do I remember the board, you read that the half sentence in Hirasawa, therefore it is suggested that its cardiovascular system and central suppressive side effects and weight gain effect are weak. The board certainly pointed to the last bit, weight gain effect are weak. Did it say anything about the... It didn't. I'm sorry. Excuse me. You really do have to let me finish my question. I'm sorry that I take a little bit more time than other people do, but please listen. Did the board address this portion of the sentence about cardiovascular system side effects are weak, which you cited as indicating not a safety problem? The board certainly quoted... When the board quoted Hirasawa, they quoted also about the cardiac events. They did not make findings on that because they'd already decided that there was no nexus, so they didn't delve further into Hirasawa's teaching, but the board certainly recognized that Hirasawa predicts few cardiovascular events because they quoted that language. In a context discussing safety? No. That's what I'm saying there, and again, I apologize for interrupting, Your Honor. Those are our reasons. I think the board, in compliance with this court's case law, correctly found that there is no nexus for the safety issue, but even if there were a nexus, Hirasawa indicates that this wouldn't be a problem. How do you respond to opposing counsel's argument that patient was inconsistently applied in terms of the claim? I think that that claim construction issue is really a red herring, and to the extent that there are inconsistencies in what the board said, I would answer it in a couple of ways. One is that much of the board's going back and forth is really an instrument of the fact that Sumitomo wouldn't commit to a claim construction. Even now, Sumitomo won't commit to a claim construction, and so the board was saying, well, even if it is, as you're now positing, a population of people, all we need is still there are going to be these outliers who will satisfy it, but that's not what's important here. What's important here is, and that's why I say this is a red herring. SAGI teaches 80% of the claimed range. SAGI teaches administering loracidone at a dose at the 20 to 100% range, or 80% of the claimed range. And if we assume, as Sumitomo argues, that people given that dosage are not going to experience clinically significant weight gain, then certainly SAGI teaches a population of patients, and so it's really a red herring. But I would also point out that the board did say, despite what it may have said in this discussion of Braintree, the board says at APPX9, APPX10, and APPX24, that a patient plus the word comprising means one or more. And finally, even if you don't agree that the board handled it correctly or not, given the substantial overlap and that SAGI teaches at least 80%, with the exception of a few outliers, a dose in which 80% of the people in the claimed range will experience no clinically significant weight gain, this really is a moot point. But even if you don't agree with that and you feel that the board mishandled the construction, that would be really a harmless error given the facts of this case, similar to the court's decision in Nanquist v. Vidal, where the district court was looking at a method of treating cancer, and the district court said it's just to killing one or more cancer cells. And this court said, well, it's actually more than that, but there's enough factual evidence here that the prior art would provide a reasonable expectation that this particular cancer drug would kill a substantial portion of cancer cells. And so those are the reasons why I really think this is a red herring. As far as the burden of persuasion, the board never shifted the burden of persuasion. The board followed this court's precedent. This court's precedent says that when you have overlapping range, and here, again, we have a substantially overlapping dose range, that creates a presumption of obviousness. And when you have a presumption of obviousness, the burden shifts, the burden of production, not the burden of persuasion, shifts to, in this case, the patent owner to come forward with rebuttal evidence. The rebuttal evidence, as I stated earlier, is related to first-generation anti-psychotic drugs. It's directed to whole classes of drugs. I'm sorry, what did you say is directed to the first generation? I missed what the pronoun was. I'm sorry. Sumatomo's rebuttal evidence to try to rebut Harasawa is directed to first-generation anti-psychotics. One's called Typicals. Yes. And in addition, it's not, so that's one reason that it's not even the closest prior art. And so when you say, what a person of ordinary skill in the art, what are they going to be looking to? The board found that loracidone was the closest prior art, and they correctly concluded that a person of ordinary skill in the art wouldn't ignore that. And again, I'd like to point out that Sumatomo is the owner of this patent of SAGI, the patent on loracidone, and it's Sumatomo's own scientist who's published that I've looked at loracidone and I predict that it's going to have a weak effect on weight gain and it's going to have a weak effect on cardiovascular issues. And so it's really their own prior art that is suggesting the claimed invention. If we find that there was some legal error in terms of the inherency analysis, for example, I assume you would agree with a vacating remand under those circumstances? No, for two reasons. The first reason is that the board just didn't find it was inherent. They found that even if it wasn't, even though they didn't express it this way, they said inherent and expected. So to me, it's not inherent because it's expected. It's inherent and, and that's what petitioner argued. So I would say that even if you don't believe it's inherent, it is reasonably expected. The second point I would like to make is that there is no petitioner in this case. The petitioner has dropped out. The USPTO has stepped in to fill its shoes and the patent is expired. I can't say that this 100% would happen, but it's highly likely that the board would not, under these circumstances, if this case were remanded, rehear this case or continue further. There's no specific rule about that? There's no specific rule about that. It's just a common practice. Pardon me? It's a common practice. Well, it's not, I can't speak to whether it's common or not. It's just, it's just likely because there's no petitioner to present the other argument. And then the patent's also expired. So there's a question about, you know, there are the questions that come up when a patent is expired. But... I assume you don't have any information about whether this case is effectively moot? No, because the board would not... Even Mr. Saunders doesn't seem to have the information, so it would be unlikely you would. I just thought I'd check. Yeah, the board wouldn't tell us in advance what they would do. They would say, oh, well, we have to see what the court comes down with. I can't testify or provide some sort of point of view as to what that is, other than to say I would think it would be likely. And the petition did not make an anticipation argument, right? Or a challenge, or did it? Right. It did not. And I suspect that is because... Isn't there a piece of anticipation doctrine that allows, you know, a substantially overlapping range being treated as effectively the same as the challenged range? The only law I could think of is that anticipation is the epitome of obviousness. But I do know that whether we're... I do know that in the world of 103, in the world of obviousness, a substantial overlap creates that presumption of obviousness. Okay. And so, I mean, I think this court... I think there could be little doubt that the claimed range is obvious. Then we're talking about whether the lack of clinically significant weight gain is obvious. And even if you don't agree that it's inherent, Harasawa certainly suggests that it is. And Harasawa is the closest prior art. Okay. All right. Thank you very much, Your Honors. Thank you, Your Honors. As Judge Toronto's question picked up on, the statement about cardiovascular effect in Harasawa is not anything the board relied on or made findings in connection with. It was refusing to consider the safety profile. Another important thing to keep in mind about Harasawa and the point of, oh, it's our own scientists doing it. Harasawa was in 1999. We're talking about a priority date in 2002. They're intervening art in the meantime that needs to be considered, most notably the Ziprasidone label in 2001 that comes in and talks about the risk of sudden death and essentially says, use other drugs first. So you can't go back to 1999 and read that one reference in isolation. In terms of the population and patient switch, it should be remanded for the board to make the proper findings. There's no finding about population under Chenery. This court can't substitute reasoning for the board. And on the burden shifting, I heard an argument today about, well, the burden of production shifts. But we clearly came forward and met our burden of production with all of the evidence we came forward with. And to be clear, the evidence that's presented and discussed at length in our brief about there not being a consistent relationship between the binding profiles and weight gain, every single one of those drugs that's mentioned in the diagrams in a brief, those are all atypical antipsychotics. So those are not first generation typical. Those are atypical. They're in this area. This is also an atypical. Ms. Kelly referred to language of the board. I think it was inherent or expected. Or the other way around. Inherent and expected? Right. I think this is another reason to remand. You won't be surprised to know. Because the section of the board's opinion from 22 to 24, I have tremendous difficulty following what it's saying. It starts by talking about Horisawa. It then says, well, you wouldn't merely dismiss Horisawa. It then pivots to its patient-patient inherency theory. And there is sort of woven in there some language about reasonable expectation of success sort of later on. But flowing out of maybe the inherency argument, I... So I do want to talk a little bit to you about the disposition. Because I feel like the disposition here seems, as it always is, important. It seems like there's a bit of disagreement. So in terms of if we were to just find error in the inherency analysis, do you think that alone is a basis to remand? Or would it be what I heard opposing counsel argue? Do you need to find error in both the inherency analysis and I think she said reasonable expectation analysis? Well, with the safety error, that supersedes all of it. So that's a remand no matter what. We've argued both prongs because we think there are errors on both of them. But I think the real answer is if there's an error on inherency, it's sufficiently unclear what's being said about reasonable expectation of success that you're maybe not saying the board is wrong in that context, but at least sending it back. It's going back anyway to get that clarification from the board as what are you saying? How do these arguments link together? Because you have this inherency finding dropped right in the middle of it. And so it's not at all clear that the board is saying something independent on reasonable expectation of success or whether it's basing that expectation argument on the inherency argument that it's stuck between the discussion of Horacella in that statement. To return to where we began, do you have any thoughts about guidance on whether we need to declare this moot? I struggle with this, Your Honor, because I think it is a genuinely difficult question. It's not traditionally in the context of someone who owns property, which has been vacated and abrogated by the government. I don't think it's fired of its own. Sure, but I don't think the analysis for our standing on appeal looks quite the same in that circumstance as a potential infringer. No, no, no. Just because there is this... That's quite different. But this is also the unusual circumstance where there shouldn't have been any entrance. Right, and so what I hesitate is we just don't know and the law gives us the entitlement to discover within the next six years that there was somebody who jumped the gun in what they were supposed to be doing, or there was a compounding pharmacy, or there was some illegal use. But in candor of the court, I cannot say to you that we are aware of such an instance and given the regulated conduct, it's much less likely than in another area that there would be. And our most important interest, just to be frank with the court, is having this reasoning be abrogated here because it's incorrect. And so if ultimately the path to that is a Muncie where they could, or because of mootness, because there's enough uncertainty in a regulated industry like that, then we're not going to fight the court on that. You know, we think with the look back period, there is enough there for the court to have jurisdiction and to affirmatively say there have been these errors made, which will provide guidance to the board going forward. But if it's sufficiently concerned about jurisdiction that it thinks it's moot, then at the very least, there should be a Muncie where they could. Thank you. Thanks to all counsel. Case is submitted.